## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **CHRISTIAN FELLOWSHIP CENTERS OF NEW YORK, INC.** a New York not-for-profit corporation, | ) ) ) ) | CASE NO.  8:19-cv-191 (LEK/DJS) |
| Plaintiff, | ) ) ) | Honorable Judge |
| **VILLAGE OF CANTON**, a New York municipal corporation, | ) ) ) ) | |
| Defendant. | ) | |

---

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

Plaintiff, Christian Fellowship Centers of New York, Inc., a New York not-for-profit corporation ("Church"), by and through its attorneys, Silver & Collins and Mauck & Baker, LLC, complains against the Defendant, Village of Canton, New York, a municipal corporation ("Village"), as follows:

### NATURE OF THE CASE

1.  This matter is about the unequal treatment of religious assemblies, and in particular the plaintiff Church, by the Village of Canton.

2.  The Village's zoning code, facially and as applied to the Church, prevents religious assembly uses from operating anywhere within the Village's C-1 commercial district. At the same time, similar nonreligious assembly uses such as theaters, pool

halls, hotels, municipal buildings, museums, and uses described as "fraternal/social

clubs/education/charitable or philanthropic" are permitted in the zone *as of right*.

3.   On its face and as applied, the Village's zoning code treats religious assemblies

on unequal terms with nonreligious assembly uses in violation of the "Equal Terms"

provision of Religious Land Use and Institutionalized Persons Act, 42 U.S.C.

2000cc(b)(1) ("RLUIPA"); see also *River of Life Kingdom Ministries v. Vill. of Hazel Crest,*

*Ill.,* 611 F.3d 367, 374 (7th Cir. 2010)("But should a municipality create what purports to

be a pure commercial district and then allow other uses, a church would have

an easy victory if the municipality kept it out.").

4.   The Village has also imposed its land use regulations in a manner that treats

similarly situated uses differently in violation of the Equal Protection Clause of the

United States Constitution. *Cleburne. Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439

(1985).

5.   The Village's zoning code also places unreasonable limitations on religious

assemblies which seek to worship in the Village in violation of the Unreasonable

Limitations provision of RLUIPA, 42 U.S.C. 2000cc(b)(3)(B).

6.   The Village's actions have further imposed a substantial burden on the Church in

violation of RLUIPA, 42 U.S.C. 2000cc(a)(1) and continue to unlawfully restrict the

Church's free exercise of religion and freedom of speech as protected by the First

Amendment to the United States Constitution.

## PARTIES

7.   Plaintiff, Christian Fellowship Centers of New York, Inc., is a New York not-for-profit corporation founded in the 1970s with five locations where members meet for worship in New York state.

8.   Defendant, Village of Canton, New York, is a municipal corporation located in Saint Lawrence County, New York.

9.   Defendant, through its boards and trustees, is responsible for the enactment and enforcement of the zoning code and actions challenged herein.

## JURISDICTION AND VENUE

10. This action arises under, *inter alia,* the First and Fourteenth Amendment to the Constitution of the United States and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") 42 U.S.C. § 2000cc 1, *et seq*.

11. This Court has jurisdiction over the subject matter of this action by virtue of U.S.C.  § 1331 (federal question jurisdiction); 28 U.S.C. § 2201 (authorizing declaratory relief); and 28 U.S.C. § 2202 (authorizing injunctive relief).

12. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(e) and 1402(a) and 5 U.S.C. § 703.

## BACKGROUND

### I.    Background of the Church.

13. The Church began its ministry in 1974 operating out of a building originally constructed as a chicken coop just outside of Ogdensburg, NY.

14. Sometime around 1978, the Church felt called by God to relocate to a new facility near Madrid, NY.

15. The Church, under the leadership of Pastor Tom Wells, continued to grow and make disciples of Jesus Christ all across northern New York.

16.  Beginning in the 1980s, the Church began fulfilling the "Great Commission" by planting additional churches across the state. In 1981, Pastor Wells started a new church in Massena, NY. Before moving to Massena, Pastor Wells and the Church installed Rick Sinclair as the new pastor of the Church.

17.  Under the leadership Pastor Rick Sinclair, the Church planted additional churches:

- Grace Covenant Church, Ogdensburg – first public services in January, 1985

- Richville Christian Fellowship, Richville – first public services in November, 1992

- Grace Community Church, Moira – first public services in January, 1996

18.  In 2001, in order to accommodate the needs of the growing congregation, the Church purchased the Old Madrid School, a 45,000 square foot facility with 53 acres of land Madrid, NY.

19. In 2011, the Church launched a new church location in Potsdam, NY.

20. In 2015, the Church then felt called by God to begin another location in Canton, NY. The Church installed Pastor Jamie Sinclair to lead the Canton congregation which launched in May 2016 in a facility which it rented from another church.

21. The Church continued to rent at that location until August of 2018 when its lease expired. Subsequently, the Church met three times at the local state university and currently rents space every Sunday morning from the Best Western hotel.

22. The Church's Canton congregation is a relatively small gathering with 34 members and an average of 82 persons in attendance each Sunday.

## II.    The Church Purchases "The Club" and the Village's Opposition

23.  While the Church was renting a facility in the Village, it quickly determined that it needed its own property in order to more effectively conduct its ministries.

24. The Church's search for a property in the Village of Canton began over two years ago in late 2016.

25. Since 2016 until most recently, the Church, despite constantly searching, had been unable to locate any property suitable for its needs and which was also permitted by the Village's zoning code.

26. During the summer of 2018, the Church learned of the sale of "the Club," (hereinafter "the Property"), a three story building that housed a former restaurant and tavern and once served as a gentlemen's club located at 25 Court Street, Canton, NY.

27. The Property, which contains a large room suitable for services and community events, smaller rooms suitable for classrooms, office space, and other amenities such as a bar for serving coffee, met all of the Church's needs.

28. The Church put an offer on the Property for $310,000.00 which the seller accepted on July 10, 2018.

29. Because the Property is located in a C-1 Commercial zone, which does not explicitly list religious assemblies as permitted uses, the Church began the process of obtaining the Village's permission to use the Property as a church. Because numerous other nonreligious assembly uses (including tax exempt ones) are permitted at the Property, the Church expected that it too would be allowed.

30. On July 20, 2018, the Church approached the Village Code Enforcement Officer Jeffrey Murray and the Village Planning Board Chairman to inform them of the Church's plans for the Property. At the direction of Mr. Murray, the Church then submitted a request to the Village Planning Board to change the use of the Property from a restaurant to a church and to obtain a certificate of occupancy.

31. On September 11, 2018, the Planning Board held a public meeting on the matter. At that meeting, a resident objected to the Church's request because it had not filed a formal application to change the use.

32.  The Village did not have a formal application so it created one for the Church to complete.

33.  At the next Planning Board meeting on October 10, 2018, the Planning Board informed the Church that it could not rule on the Church's application which Mr. Murray told the Church to put before the Planning Board because Mr. Murray was required to review it first.

34. On October 23, 2018, Mr. Murray denied the Church's application.

35. The Church then appealed Mr. Murray's decision to the Zoning Board of Appeals and requested an interpretation of the Village zoning code to determine whether churches should be a permitted use in the C-1 district like other nonreligious assembly uses.

36. The Zoning Board of Appeals held public meetings in November 2018, December 2018, and ultimately ruled at a January 2019 meeting that religious assemblies were not permitted in the C-1 district.

37.  On January 24, 2019, the Zoning Board of Appeals issued a written decision informing the Church that zoning code does not violate the Church's civil rights because churches can meet in other parts of the Village. The Village further ruled that

7

churches were not being treated unequally because New York law places a restriction

on liquor licenses for uses within 200 feet of a place of worship, and no such restriction

exists for other nonreligious assembly uses permitted in the C-1 zone. The Village

concluded, therefore, that the Church was not similar to the other permitted

nonreligious assembly uses. **Exhibit A, Jan. 24 Decision**.

38. The conclusory ruling by the Village cited no evidence that there were any plans,

or even a likelihood, of a liquor store or business serving liquor locating within 200 feet

of the Property. Nor did the decision have any finding or study that the Village did not

have enough locations for the sale of liquor. In fact, the Village zoning map, on its face,

shows that the overwhelming number of properties in the Village are not within 200

feet of churches or schools in the Village.

39. In early December, while the Zoning Board of Appeals was still considering the

Church's request, the Church submitted two additional requests: (i) a request to Mr.

Murray to use the Property for office use, a use which is specifically permitted by the

Village zoning code and (ii) a request to the Village Planning Board to obtain a "special

exception" to use the Property as a church because it is a similar use to other uses

delineated in the C-1 zone. (The relevant provisions of the zoning code are addressed

below, with relevant portions of the zoning code attached as exhibits to this Complaint).

40. The Code Enforcement Officer, Mr. Murray, denied the Church's request to use

the space as an office and the Village Planning Board tabled the special exception

application until the Zoning Board of Appeals ruled on whether the Church should be permitted as of right in the C-1 zone.

41. On December 20, 2018, the Church appealed Mr. Murray's decision to deny the use of the Property for office space to the Zoning Board of Appeals.

42. Although an office use is specifically permitted in the C-1 zone, on January 28, 2019, the Zoning Board of Appeals refused to grant the Church permission to have offices at the Property stating that it needed more time to reach a final decision. **Exhibit B, Jan. 29th Article.**

43. According to the Village Zoning Board of Appeals Chairman Conrad Stuntz, "[t]here's a lot of fear. If the door opens it will be wedged and opened further." *Id.*

44.  The Village has not taken any steps on the Church's request to obtain a special exception to use the Property as a church. As stated by the Code Enforcement Officer, Mr. Murray, "I'm still trying to figure this whole thing out" . . . "We have to figure out how this proceeds. I'm still confused about what the proper procedure is. I'm waiting for people who are smarter than me to tell me what to do." **Exhibit C, Feb. 1st Article.**

45. Throughout the process, neighbors have been vocal in their opposition to the Church, citing its tax exempt nature and questioning its beliefs on LGBTQ issues.

46.  Three other churches meet on Court Street, including the Canton United Methodist Church, the Seventh Day Adventist Church, and St. Mary's Catholic Church.

47. Another entity called the Church and Community Program operates freely within the C-1 district. The Church and Community Program was established by clergy of local churches to meet the needs of the community.  The Church and Community Program's objective is to help those in need, and its activities like a food pantry, are similar to those of the Church which also seeks to help those in need and also conducts a food pantry.

48.  According to Planning Board Chairman Barry Walch, however, "[t]here's a big difference between worship and acts such as giving out food." The Chairman further emphasized, "[w]e have to say no to anything that is truly a church." **Exhibit D, February 5th Article**.

### III.    The Village's Zoning Code.

49. The Village's zoning code establishes fourteen (14) different zoning districts within the Village's jurisdiction.  **Exhibit E, Zoning Districts.**

50. Of the 14 zoning districts in the Village, religious assemblies are only permitted, *as of right*, in one (1) district, the B-1 Business district. **Exhibit F, B-1 Zone**.

51. Although religious assemblies are only permitted by right in one (1) district, similar nonreligious assemblies are permitted, by right, in several districts in the Village. For instance:

- Municipal buildings- permitted, as of right, in 5 districts.

- Hotel/Motel- permitted, as of right, in 4 districts.

- Museums- permitted, as of right, in 4 districts.

- Theaters – permitted, as of right, in 3 districts.

- Fraternal and social clubs- permitted, as of right, in 3 districts.

- Charitable and philanthropic- permitted, as of right, in 3 districts.

52. The zoning code does provide that religious assemblies may meet in two residential zones, but only if they apply for, and are granted, a "special exception" by the Village. In addition to needing a special exception, religious assemblies that wish to meet in a residential zone are required to meet on lots with a minimum of at least three (3) acres, approximately five times more than other nonreligious assemblies such as libraries and museums. **Exhibit G, R-1 and R-2 Zones**.

53. The Property is currently located in a C-1 Retail Commercial zoning district. According to the Village zoning code, the purpose of the district is to "[d]elineate a central area where shopping, recreational and cultural facilities are provided for the community as a whole." **Exhibit H, C-1 Zone**.

54. Although the Village does not specifically permit religious assemblies in the C-1 district, it does permit, as of right, numerous other nonreligious assemblies uses such as:

- "Theaters"
- "pool hall"
- "Hotel or motel"
- "Municipal or government building"
- "Museum"
- "Fraternal/social clubs/education/charitable or philanthropic."

11

*Id.*

55.  Although the zoning code does not specifically permit religious assemblies as of right, the zoning code does permit by "special exception" "[u]ses deemed similar to the uses otherwise permitted in the C-1 district." *Id.*

56.  The zoning code also permits in the C-1 district, as of right, "business or professional office or studio" including "office equipment." *Id.*

57.  The Village's zoning code facially treats religious assemblies on unequal terms with nonreligious assembly uses.

58.  A recent news article reported that because of the Church's attempts to use the Property as a church, the Village is looking to revise its code.  The Village's attorney has conceded that the Village zoning code is faulty by stating "[t]he current zoning could use a lot more clarity and a lot more definitions." **Exhibit I, Jan. 24th Article.**

**IV.    The Church's religious exercise and ministries.**

59.  Since its founding in 1974, the Church has conducted, and still intends to conduct, the following ministries and religious exercises, all of which are compelled by and integral to the sincerely held religious beliefs of the Church and its members:

a.   weekly assembly of the congregation to worship (Hebrews 10:25);

b.  weekly preaching, including speech relating to personal morality, God, social, cultural and political issues (2 Timothy 4:2);

c.   pastoral counseling for the disturbed, lonely and bereaved (Acts 20:28);

d.   prayer meetings (Acts 1:13-14);

12

e.   singing and musical performances (Psalms 81:1-2);

f.   baptisms, weddings, and communion (Matthew 28:19; Luke 22:19);

g.   Bible studies (Psalm 110, 2 Tim. 3:16);

h.   service projects for members of the congregation, the poor, youth, and the general community (James 1:27);

i.   evangelism - sharing the Christian message and encouraging others to believe in Jesus the Messiah, particularly those who visit the church meetings (Matt. 28:16-20);

j.   financial giving to support the Church and its ministries to the poor and to the members in need (Mal. 3:8-10); and

k   church planting.

60.   The Church's ministries currently include a (i) mid-week service for young adults, which it conducts at the Church's Potsdam location, (ii) small groups; (iii) food pantry, which it conducts at the Church's Madrid location; (iv) arts program including theater camp and dance classes; (v) assisting in community events such as local festivals and charity runs; and (vi) a homeschool cooperative. The Church also supports international missions by sending out missionaries and supporting those in the mission field.

61.   The Church believes that all of its ministries are in furtherance of its mission and constitute acts of worship.

## V.    Burdens on the Church.

62. The Village's zoning code and actions opposing the use of the Property as a church have placed substantial burdens on the Church.

63. The Church has spent more than two years looking for a suitable property in the Village but because of the Village's restrictions on religious assemblies, the Church for years could not find one suitable property that was permitted under the zoning code and within the Church's limited budget.

64. Accordingly, the Church has been at the mercy of others who have allowed the Church, for a time, to meet at various locations.

65. By not having a permanent home, the Church cannot engage in the full range of ministries that it hopes to engage in once it has its own property. Many ministries cannot be effectively carried on without a place to meet throughout the week.

66. Indeed, the Church's Canton congregation currently conducts multiple ministries in other parts of the state because they have no property of their own in Canton.

67. The lack of a permanent home has also created uncertainty among the congregants - a common question heard these days is "Where will church meet next week?"

68. The lack of a permanent home has also generated a lack of momentum among the Church's congregants.

69.  Moreover, the Church continues to face the weekly inconvenience of not having a property in the Village. Setting up for church services is onerous requiring extra time and energy every week because church members must haul equipment, instruments, books, and more, to the Best Western hotel early every Sunday morning.

70. In addition, the Church's music groups do not have a suitable place to rehearse during the week, nor does the Church have proper facilities for Sunday School at the hotel.

71.  In addition, the Church current pays approximately $2,000 a month to rent the hotel space, funds which could be going to pay off the Church's mortgage on the Property.

**COUNT I**
**VIOLATION OF RLUIPA, 42 U.S.C. 2000cc(b)(1)**
**EQUAL TERMS PROVISION**

72. The allegations contained in all preceding paragraphs are incorporated here by reference.

73.  Section 2(b)(1) of RLUIPA prohibits the Village from treating a religious assembly use less favorably than a nonreligious assembly use:

(1) Equal Terms
No government shall impose or implement a land use regulation in a manner that treats a *religious assembly or institution* on less than equal terms with a *nonreligious assembly or institution*. (italics added).

74.  RLUIPA's legislative history identifies as quintessential comparators to religious assemblies "gyms, places of amusement, recreation centers, lodges, libraries, museums, municipal buildings, meeting halls, and theaters." H. REP. 106-219 at 19 (July 1, 1999).

75. Likewise, numerous federal courts have identified those uses and others like the ones the Village permits in the C-1 district as the same uses with which religious assemblies must be treated equally.

76. The Village, by permitting as of right, various nonreligious assembly uses in the C-1 district, but denying the same right to religious assembly uses, violates RLUIPA's equal terms provision.

77. Likewise, by permitting nonreligious assemblies  to meet, as of right, widely across the Village, but limiting religious assemblies to only one (1) district where they can meet by right, the Village violates RLUIPA's equal terms provision.

**WHEREFORE**, the Church respectfully prays that the Court grant the relief set forth in the prayer for relief.

## COUNT II
## EQUAL PROTECTION CLAUSE OF
## THE FOURTEENTH AMENDMENT

78.     The allegations contained in all preceding paragraphs are incorporated here by reference.

79.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution requires that the government treat similarly situated assembly uses equally as set for in *Cleburne*. *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

80.     The Church in this case is similarly situated with other assembly uses which, as explained above, the Village treats more favorably.

81.     Likewise, by permitting the Church and Community Program to operate freely within the C-1 district but denying the same right to the Church, the Village treats a similarly situated entity more favorably than the Church.

82.     Because the Village does not treat similarly situated assembly uses equally, the Village violates the Equal Protection Clause of the Fourteenth Amendment.

**WHEREFORE**, the Church respectfully prays that the Court grant the relief set forth in the prayer for relief.

## COUNT III
## VIOLATION OF RLUIPA, 42 U.S.C. 2000cc(a)(1)
## SUBSTANTIAL BURDEN PROVISION

83.     The allegations contained in all preceding paragraphs are incorporated here by reference.

84.     Section 2000cc (a)(1) of RLUIPA provides (italics added):

(1) General rule.
    No government shall impose or implement a land use regulation that imposes a *substantial burden* on the *religious exercise* of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution-

(A) is in furtherance of a compelling governmental interest; and;

(B) is the least restrictive means of furthering that compelling governmental interest.

85.     The Village has imposed a substantial burden on the Church. The factors and facts relevant to the substantial burden analysis are the following:

86.     The Church has great needs and limited resources. *See World Outreach Conference Center v. City of Chicago*, 591 F.3d 531, 537-538 ("whether a given burden is substantial depends on its magnitude in relation to the needs and resources of the religious organization in question.").

87.     The Village has imposed its land use regulations in a manner which has created undue delay, uncertainty, and expense upon the Church. *See World Outreach*, 949 F. Supp. 2d 826, *849; see also *World Outreach*, 591 F.3d 531, at 534, 537 citing *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 901 (7th Cir. 2005).

88.     The Village imposed the burdens on the Church in an arbitrary and capricious manner. See *World Outreach*, 797 F.3d 839, 842 (7th Cir. 2015); see also *Roman Catholic Bishop v. City of Springfield*, 724 F.3d 78, 96-97 (1st Cir. 2013).

89.     Upon information and belief, the restrictions and processes imposed on the Church were designed to reach a predetermined outcome contrary to the Church's requests.

90.     The cumulative effect of the various burdens which the Village imposed on the Church are substantial. See *Roman Catholic Bishop*, 724 F.3d at 95 ("We recognize different types of burdens and that such burdens may cumulate to become substantial.").

91.     In addition, the unequal terms of the Village's zoning code on religious assemblies impose a substantial burden on the Church and its members.

92.     The Church can prove a substantial burden on its religious exercise without "proving that there is an unconstitutional motivation behind a law…" 146 Cong. Rec. S6688 (daily ed. July 27, 2000) (statement of Sen. Orrin G. Hatch).

93.     The Village cannot prove that its actions are supported by a compelling governmental interest or that they are the least restrictive means of furthering any governmental interest, let alone a compelling one.

**WHEREFORE**, the Church respectfully prays that the Court grant the relief set forth in the prayer for relief.

## COUNT IV
## VIOLATION OF RLUIPA, 42 U.S.C. 2000cc(b)(3)(B).
## UNREASONABLE LIMITATIONS PROVISION

94. The allegations contained in all preceding paragraphs are incorporated here by reference.

95. Section (b)(3)(B) of RLUIPA prohibits the Village from placing unreasonable limitations on religious assemblies:

(1) Exclusions and limitations

No government shall impose or implement a land use regulation that—

(A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

96. The Village's zoning code places unreasonable limitations on religious assemblies. See RLUIPA legislative history ("[w]hat is reasonable must be determined in light of all the facts, including the actual availability of land and the economics of religious organizations." 146 Cong. Rec. E1563 (daily ed. Sept. 22, 2000) (statement of Rep. Canady)).

97. Although nonreligious assembly uses are permitted, as of right, widely across the Village, religious assembly uses are only permitted, as of right, in one (1) of the Village's fourteen (14) zoning districts.

98. The one district where religious assemblies are permitted as of right, the B-1 Business district, is largely built up and contains few, if any, properties where new religious assemblies can locate or which have the parking required to operate in the Village.[1]

99. Although religious assemblies may locate in the Village's two residential districts, they can only do so by submitting to a discretionary process by applying for a "special exception."

---

[1] The Village requires religious assemblies to have 1 off-street parking spot for every 8 seating spaces in the main assembly room, plus 1 for each employee on maximum shift. See Village zoning code § 325-41.

100.     Upon information and belief, the Village does not have, or until recently did not have, a formal application for special exception and decisions on special exceptions have been made upon the undefined "discretion" of Village officials.

101.     In addition, religious assemblies, unlike other nonreligious assemblies, face additional hurdles in locating in one of the two residential districts because the zoning code requires them to locate on a three (3) acre lot minimum.

102.     Thus, even within the residential zones, which does not permit religious assemblies as of right, religious assemblies are severely limited in where they could locate, requiring them to find whatever few 3 acre lots exist, or to purchase several adjacent lots together.

103.     For all practical purposes, there are few, if any, properties where religious assemblies may locate in the Village, as of right, and in accordance with the Village's zoning code. See e.g., *Chabad of Nova, Inc. v. City of Cooper City*, 575 F. Supp. 2d 1280, 1291 (S.D. Fla. 2008) (Although 85% of the city was zoned to permit religious assemblies, summary judgment in favor of plaintiff was proper where there was "lack of available properties" in which "religious assemblies are permitted to enter" and "the only properties available to religious assemblies" could be purchased only at "great expense.").

**WHEREFORE**, the Church respectfully prays that the Court grant the relief set forth in the prayer for relief.

## COUNT V
### FREE EXERCISE CLAUSE

104.     The allegations contained in all preceding paragraphs are incorporated here by reference.

105.     When government forbids where people may worship it must have a strong and overriding reason for doing so. *See Church of Lukumi Babalu Aye v. Town of Hialeah*, 508 U.S. 520, 531-532 (1993).

106.     Defendants have infringed on the Church's hybrid rights of free exercise, freedom of assembly, freedom of association, and freedom of speech. *See Church of the Lukumi Babalu Aye, Inc. v. Town of Hialeah*, 508 U.S. 520, 567 (1993).

**WHEREFORE**, the Church respectfully prays that the Court grant the relief set forth in the prayer for relief.

## COUNT VI
### FREE SPEECH CLAUSE

107.     The allegations contained in all preceding paragraphs are incorporated here by reference.

108.     The Church's religious speech activities- preaching, singing, worship, prayer, and teaching- are protected under the Free Speech Clause of the First Amendment to the United States Constitution.

109.     In prohibiting and/or unreasonably limiting the location of the Church, the Village restricts the Church's free speech.

110.     The Village's actions and zoning code do not leave open ample alternative channels of communication and do not qualify as a reasonable time, place, or manner restrictions.

111.     The Village's zoning code operates as an impermissible prior restraint on speech, granting overly broad discretion to decision-making officials to decide whether to exclude religious uses, including but not limited to expressive association and speech.

112.     The Village's zoning code constitutes a content based speech regulation.

113.     The Church's ability to communicate its message to those at and around the Property has been unduly limited in violation of the Free Speech Clause of the First Amendment.

**WHEREFORE**, the Church respectfully prays that the Court grant the relief set forth in the prayer for relief.

## PRAYER FOR RELIEF

**WHEREFORE**, the Church, respectfully requests relief as follows:

A.  Declare that the Village's zoning code, and its implementation of the same, facially and as applied, violates the Equal Terms, Substantial Burden, and Unreasonable Limitations provisions of the Religious Land Use & Institutionalized Persons Act, 42 U.S.C. 2000cc, *et. seq.*, the Free Exercise Clause and Free Speech Clause of the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment;

B.  Enjoin the Village, its officers, agents, employees, attorneys and all other persons acting in active concert with it, from enforcing its zoning code, both facially and as applied to the Church, and from preventing or attempting to prevent the Church from using the Property as a church and as an office;

C.  Award damages for violation of the Church's constitutional and statutory rights and for the injuries and unlawful burdens it has incurred;

D.  Award the Church its costs and expenses of this action, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, and other applicable law;

E.  Grant such other relief as this Court deems appropriate.

Respectfully submitted this 8th day of February, 2019.


By:  /s/ John W. Mauck

John W. Mauck, Esq.*
IL Bar No. 1797328
Sorin A. Leahu, Esq.*
IL Bar No. 6315515
**Mauck & Baker, LLC**
One N. LaSalle St., Suite 600
Chicago, Illinois 60602
Telephone:  312-726-1243
Facsimile:   866-619-8661
jmauck@mauckbaker.com
sleahu@mauckbaker.com

*Pro hac vice pending*

By:  /s/ John Collins

John Collins
NY Bar No. 515929
**Silver and Collins**
44 Court Street
Canton, NY 13617
Telephone: 315-386-8506
Facsimile: (315) 386-8507
jcollins@silverattorneys.com

## VERIFICATION OF COMPLAINT

I, Jamie Sinclair, pastor of Canton congregation of the Christian Fellowship Centers of New York, Inc., and a citizen of the United States and a resident of the State of New York, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct.

Executed this 7th day of February, 2019.

Pastor Jamie Sinclair

21