UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

CHRISTIAN FELLOWSHIP CENTERS
OF NEW YORK, INC.,

                    Plaintiff,

        -against-                                    8:19-cv-191 (LEK/DJS)

VILLAGE OF CANTON,

                    Defendant.

_____

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

        Last July, Plaintiff Christian Fellowship Centers of New York, Inc. (the "Church")

bought a former restaurant at 25 Court Street in downtown Canton, New York (the "Property")

intending to use it as a church. However, Section 325-11 (the "Ordinance") of the Canton

Village Code prohibits houses of worship from operating in the downtown zone even though it

permits not-for-profit organizations to use nearby properties to meet for secular purposes. See

Dkt. Nos. 22-5 ("Zoning Code"), 22-6 ("Zoning Board of Appeals Record") at 25, 42–43.[1] The

Church claims that the Zoning Code and the Ordinance violate the Free Speech and Free

Exercise Clauses of the First Amendment, the Equal Protection Clause of the Fourteenth

Amendment, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"),

42 U.S.C. §§ 2000cc(a)(1), (b)(1), (b)(3)(D). Dkt. No. 1 ("Complaint") ¶¶ 72–113.

        The Church now moves for a preliminary (or permanent) injunction requesting that the

Court (1) enjoin the Village of Canton (the "Village") from enforcing the Ordinance and the

_____

[1] The Village Zoning Code and ZBA Record are Exhibits A and B, respectively, to the
Affidavit of ZBA Chairperson Conrad Stuntz, which is attached to the Village's opposition to the
Motion. Dkt. No. 22 ("Opposition").

1

Zoning Code; (2) declare them unlawful; and (3) order the parties to confer concerning damages. Dkt. No. 13 (the "Motion"). For the following reasons, the Motion is granted in part and denied in part. The Village is enjoined from enforcing the Ordinance to prevent the Church from using the Property as a church pending further proceedings to determine whether the injunction should be made permanent.

## II.     LEGAL STANDARD

To obtain a preliminary injunction against "government action taken in the public interest pursuant to a statutory or regulatory scheme," a plaintiff must show that it is likely (first) to succeed on the merits and (second) to suffer irreparable injury without an injunction. See Cent. Rabbinical Cong. of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene, 763 F.3d 183, 192 (2d Cir. 2014). "Third . . . the balance of hardships between the plaintiff and defendant" must "tip in the plaintiff's favor." Salinger v. Colting, 607 F.3d 68, 80 (2d Cir. 2010). Fourth, "the public's interest" must in fact "weigh in favor of granting [the] injunction." Id.

## III.    FACTUAL BACKGROUND

### A.  The Church and the Property

The Church is a New York not-for-profit corporation founded in the 1970s. Compl. ¶¶ 7, 13. It began its ministry in 1974 near Ogdensburg, New York, operating out of a building once used as a chicken coop, and now has five locations in New York State where members meet to worship. Id. ¶¶ 7, 13–9. In May 2016, the Church launched a congregation in the Village and appointed Pastor Jamie Sinclair to lead it. Id. ¶ 20. It rented space from another local church until August 2018, when its lease expired. Id. ¶ 20–21. Since then, the Canton congregation has met three times at a local university and now rents space every Sunday at the Best Western Hotel. Id. ¶ 21. It has thirty-four members and averages eighty-two attendees each Sunday. Id. ¶ 22.

During the two years since he launched the Canton congregation, Sinclair searched for a permanent property in the Village to hold worship services and conduct other religious activities, such as prayer meetings, musical performances, community service projects, and evangelism. Id. ¶¶ 24–25, 59. Finally, in the summer of 2018, the Church learned that a suitable building located at 25 Court Street, Canton, formerly home to a local restaurant called "the Club," was for sale. Id. ¶¶ 26–27. The Church moved quickly to purchase it. Id. ¶¶ 28. The seller accepted the Church's offer on July 10, 2018, and the sale closed a few months later. Id. ¶ 28; ZBA R. at 37.

## B. The Zoning Code

Under the Village Zoning Code, 25 Court Street is in the downtown C-1 Retail Commercial District, one of 14 zoning districts in the Village. See Village of Canton 2016 Zoning Map.[2] The Ordinance states that

> [t]he purpose of the C-1 Retail Commercial District is to: (1) [d]elineate a central area where shopping, recreational, and cultural facilities are provided for the community as a whole;" and (2) [e]ncourage new development in the central business district by providing for public and commercial parking areas for business and patrons of the district.[3]

Village Code, § 325-11(A). The Ordinance limits the use of buildings in the C-1 zone to specified uses, which include retail store, launderette, restaurant or tavern, bowling alley, pool hall, and theater, as well as "museum," "municipal or government building," and "[f]raternal/social clubs/education/charitable or philanthropic." Id. § 325-11(B).

---

[2] A hard copy of the map was filed conventionally with the Court on March 26, 2019.

[3] The Village has not relied on the second, parking justification in this case. See ZBA R. at 42 ("The implications of parking, while discussed, were not used to make [the ZBA's] decision.").

**C. Administrative Proceedings**

Because the Ordinance did not specify "religious assemblies" as a permitted use, on July 20, 2018, the Church approached the Village Code Enforcement Officer and the Village Planning Chairman. Id. ¶ 30. At the direction of those officers, the Church submitted a request to the Planning Board to change the use of the Property from a restaurant to a church and to obtain a certificate of occupancy. Id. On September 11, 2018, the Planning Board held a meeting on the matter, at which Sinclair and members of the public weighed in. Id. ¶ 31. A month after the hearing, the Code Enforcement Officer denied the Church's request. Id. ¶ 33.

Plaintiff appealed to the Village Zoning Board of Appeals (the "ZBA"), asking that it deem the church to be a "[f]raternal/social club/education/charitable or philanthropic" use permitted in the C-1 zone. ZBA R. at 3, 8–10, 24. However, the ZBA affirmed the Code Enforcement Officer's decision, concluding that "based on the village code a church is not an allowed use in a C-1 commercial district." ZBA R. at 42. Conrad Stuntz, the Chairperson of the ZBA, later elaborated:

> [a]s described by the Village's Zoning Code, 'church religious institution' use is expressly permitted as a matter of right in the Business District (or 'B-1') zone ([Zoning Code] § 325-10(B)(1)(j)) and permitted by Special Exception (or 'special permit') in both 'R-1' and R-2' residential District (Ex. A § 325(B)(2)(d)),

but "church religious institution" is not named as a permitted use in the C-1 zone. Dkt. No. 22-4 ("Affidavit of Conrad Stuntz") ¶ 8; Zoning Code § 325-11(B); cf. Russello v. United States, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").[4]

---

[4] On March 4, 2019, the Village allowed the Church to operate 25 Court Street as a church office, but not to hold "assemblies for worship." Dkt. No. 22-7 ("March 2019 ZBA Decision") at 32; see also Stuntz Decl. ¶¶11–12.

**D. These Proceedings**

The Church filed this case on February 11 and the Motion on March 7, 2019. The Motion

relies on only two of the Church's claims against the Village. Mot. ¶ 2. It requests that the Court,

under Rules 57 and 65 of the Federal Rules of Civil Procedure:

> A. Declare that the Village's zoning code, on its face and as applied [to the Church]
> violates the Equal Terms provision of [RLUIPA] and the Equal Protection Clause
> of the Fourteenth Amendment; B. . . . [E]njoin the Village . . . from enforcing its
> zoning code, both facially and as applied to the Church, and from preventing or
> attempting to prevent the Church from using its property as a church; C. Direct the
> parties to confer regarding the Church's damages for the violations of its
> constitutional and statutory rights, as well as its costs and expenses of this action,
> including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1983, and other
> applicable law; [and] D. Grant such other relief as this Court deems appropriate.

Mot. at 3.

The Court set an expedited briefing schedule, but it allowed the Village to request any

necessary extension before its response was due. Dkt. Nos. 16, 18 ("March 8 Text Orders"). The

Village later reported it would not request an extension. Dkt. No. 20 ("March 15 Report"). The

Motion is now fully briefed. Dkt. Nos. 14 ("Church's Memorandum"), 22 ("Opposition"), 23

("Reply"). Also, the United States filed a Statement of Interest in support of the Church. Dkt.

No. 27 ("Statement of Interest"). [5] The Village submitted a second brief in response. Dkt. No. 31

("Response to United States").

## IV. DISCUSSION

### A. Ripeness

At the threshold, the Village argues that this case is unripe for judicial review because the

Church did not request a variance from the Zoning Code. Opp'n at 17–19. "Ripeness is a

---

[5] 28 U.S.C. § 517 authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States." The United States has an interest in protecting the rights guaranteed by RLUIPA, and the Act charges the Attorney General with enforcing its provisions. § 2000cc(b)(1).

doctrine rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority." Murphy v. New Milford Zoning Comm'n, 402 F.3d 342, 347 (2d Cir. 2005). It depends on (1) "the fitness of the issues for judicial decision"—whether the issues require "further factual development" to attain a "more concrete and final form"—and (2) "the hardship to the parties" that would result if the Court deferred judicial review. Id. (quoting Abbott Labs v. Gardner, 387 U.S. 136, 149 (1967)). The Supreme Court has crafted special ripeness rules for as-applied challenges to land-use regulations and "condition[ed] federal review" in such cases "on a property owner submitting at least one meaningful application for a variance." Id. at 348 (citing Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172 (1985)). In Murphy, the Second Circuit held that Williamson required the plaintiff-homeowners, who challenged a cease-and-desist order purporting to enforce a zoning ordinance, to seek a variance before suing. Id.

While a claim that the Ordinance is invalid "*as applied* to [the Church's] property" might "be unripe for this reason, [the Church] mount[s] a *facial* challenge to the ordinance," meaning that Williamson, and therefore Murphy, is inapplicable. Yee v. City of Escondido, 503 U.S. 519, 533–34 (1992); see also MacDonald v. Safir, 206 F.3d 183, 189 (2d Cir. 2000)("[T]here is no need for a party actually to apply or to request a permit in order to bring a facial challenge to an ordinance (or parts of it)."). The ZBA concluded that the Ordinance excludes churches, but not comparable secular institutions, from operating in the C-1 zone as of right and requires them to apply for a variance to do so. ZBA R. at 43. The Church contends that the Ordinance discriminates against religious assemblies on its face, not only in the way it was applied to the Church.[6] This claim turns on the text of the Ordinance as interpreted by the ZBA, and no more

---

[6] The Second Circuit explained the difference between facial and as-applied challenges in Field Day, LLC v. Cty. of Suffolk:

facts are required to resolve it. See Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona, 915 F. Supp. 2d 574, 595 (S.D.N.Y. 2013) (holding that facial RLUIPA challenges were "ripe the moment the challenged regulation or ordinance [was] passed" even though plaintiff did not apply for a permit or variance) (quoting Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 736 n.10 (1997)); Opulent Life, 697 F.3d at 287 (holding that RLUIPA challenge to ordinance on its face was "easily ripe" even though church did not pursue a variance).

Indeed, this case is ripe for resolution on the papers. "An evidentiary hearing is not required" before granting or denying a motion for a preliminary injunction "when the relevant facts either are not in dispute" or when a party "waive[s] its right to an evidentiary hearing." Charette v. Town of Oyster Bay, 159 F.3d 749, 755 (2d Cir. 1998). The Church "believes . . . that this Court may simply rule on the submitted briefs." Dkt. No. 25 ("Church's March 22 Report"). The Village requests oral argument but concedes that the only disputed issue of material fact is whether the Church has a place to hold worship services this Sunday, March 31, 2019. See Dkt. No. 28 ("Village's March 26 Report") (indicating that if the Motion "is not . . . based upon . . . the Plaintiff's [in]ability to hold worship services or engage in religious activities on March 31, 2019—but rather, solely based on the Village's Zoning Code; then there are not material questions of fact and no need for an evidentiary hearing"). The Court will not consider the Church's alleged lack of alternative space for March 31 services in deciding the Motion. As

---

A 'facial challenge' to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual [while] [a]n 'as-applied challenge' . . . requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right.

463 F.3d 167, 174 (2d Cir. 2006).

discussed later, other facts warrant a finding that the Ordinance irreparably harms the Church, and the Village has not submitted evidence that places those facts in genuine dispute.

**B. Likelihood of Success on the Merits**

**a. RLUIPA**

RLUIPA is "the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens" on land use and the rights of institutionalized persons, "consistent with [Supreme Court] precedent." Cutter v. Wilkinson, 544 U.S. 709, 714 (2005). To that end, RLUIPA enacted three provisions concerning land use. The first prohibits a "government" from using a land use regulation to impose a "substantial burden on the religious exercise of a person, including a religious assembly or institution." 42 U.S.C. § 2000cc(a)(1). The other provisions forbid such regulations to impose unequal burdens or discrimination against religious institutions and assemblies. § 2000cc(b)(1)–(2). Although the Complaint asserts that the Village has violated all three provisions, the Motion relies only on the second, "Equal Terms" provision. Mot. ¶ 3 (citing § 2000cc(b)(1)).

The Equal Terms provision states that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." § 2000cc(b)(1). "Under this provision, the plaintiff bears the initial burden to 'produce[] *prima facie* evidence to support a claim' of unequal treatment, after which the 'government . . . bear[s] the burden of persuasion on any element of the claim.'" Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n, 768 F.3d 183, 196 (2d Cir. 2014) (quoting § 2000cc-2(b)).

"Determining whether a municipality has treated a religious entity 'on less than equal terms' requires" the Court to compare "that religious entity and a secular one." Third Church of Christ, Scientist, of N.Y.C. v. City of New York, 626 F.3d 667, 669 (2d Cir. 2010). But the

courts of appeal disagree on the appropriate grounds for comparison. The Eleventh Circuit has held that an ordinance violates RLUIPA anytime the face of the law permits a secular assembly (as defined in the dictionary) and excludes houses of worship—unless the exclusion is necessary to serve a compelling government interest. Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1230–31 (11th Cir. 2004).

In contrast, the Third and Seventh Circuits believe that "[p]ressed too hard, this approach would give religious land uses favored treatment;" a zone that allows a gymnasium, but excludes assemblies of professional organizations and secular humanities societies would nevertheless be required to permit comparable religious assemblies. See River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill., 611 F.3d 367, 368 (7th Cir. 2010); Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch, 510 F.3d 253, 268 (3d Cir. 2007). Therefore, in those circuits, the plaintiff cannot rely on *just any* better-treated secular assembly. Rather, in the Third Circuit, the plaintiff must "show that it was treated less well than a nonreligious comparator *that had an equivalent negative impact on the aims of the land-use regulation*." Lighthouse, 510 F.3d at 266 (emphasis added). The Seventh Circuit also requires the plaintiff to show that a better-treated secular assembly is "similarly situated" to the church, but "shift[s] [the] focus from regulatory *purpose* to accepted zoning *criteria*" such as "commercial," "residential," or "industrial." River of Life, 611 F.3d at 373. [7] Thus, a village may exclude churches from a zone so long as it applies

---

[7] In doing so, the court sought to prevent "speculation concerning the reason behind [the] exclusion of churches" and municipal officials' self-serving representations regarding their "intentions" from controlling RLUIPA's application. River of Life, 611 F.3d at 373. The Fifth and Ninth Circuits follow variations of the Seventh and Third Circuit's tests. See Opulent Life Church v. City of Holly Springs, Miss., 697 F.3d 279, 292 (5th Cir. 2012) (focusing on "the regulatory purpose or zoning criterion behind the regulation at issue, as stated explicitly in the text of the ordinance or regulation"); Centro Familiar Cristiano Buenas Nuevas v. City of Yuma, 651 F.3d 1163, 1172 (9th Cir. 2011) (requiring the government to "demonstrate that the [treatment of secular and religious assemblies on] less-than-equal-terms [is] on account of a legitimate regulatory purpose, not the fact that the institution is religious in nature").

"conventional criteria for commercial zoning in banning noncommercial land uses from a part of the village suitable for a commercial district." <u>Id.</u> at 373–74. "But should a municipality create what purports to be a pure commercial district and then allow other uses, a church would have an easy victory if the municipality kept it out." <u>Id.</u>

These tests all assume that the Equal Terms provision codifies the Supreme Court's jurisprudence applying the Free Exercise Clause of the First Amendment. <u>See</u> <u>Lighthouse</u>, 510 F.3d at 264; <u>Midrash</u>, 366 F.3d at 1232; <u>Petra Presbyterian Church v. Vill. of Northbrook</u>, 489 F.3d 846, 849 (7th Cir. 2007). "Neutral" laws of "general applicability" do not violate the Free Exercise Clause even if they impose incidental burdens on religious exercise. <u>Cent. Rabbinical Cong.</u>, 763 F.3d at 193 (citing <u>Employment Division v. Smith</u>, 494 U.S. 872, 879 (1990)). Importantly, a law is not neutral if it is "specifically directed at [a] religious practice," or "targets religious conduct for distinctive treatment," and a law is not "generally applicable" if "it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it." <u>Id.</u> at 194, 197 (citing <u>Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah</u>, 508 U.S. 520, 533 (1993)). In other words, to avoid strict scrutiny, zoning regulations must pursue religion-neutral aims "evenhandedly," "generally allowing the kinds of uses that would further the legislative goals and prohibiting the uses that would interfere with them." <u>Lighthouse</u>, 510 F.3d at 275–76. Laws may not "single out the religious for disfavored treatment." <u>Trinity Lutheran Church of Columbia, Inc. v. Comer</u>, 137 S.Ct. 2012, 2015 (2017).

The Second Circuit has "yet to decide the precise outlines of what it takes to be a valid comparator under RLUIPA's equal-terms provision." <u>Third Church of Christ</u>, 626 F.3d at 669. However, it has held that "RLUIPA . . . is less concerned with whether formal differences may be found between religious and non-religious institutions—they almost always can—than with

whether, in practical terms, secular and religious institutions are treated equally." Id. at 671.

Therefore, "[f]ormal differences" between religious and secular "institutions [that] are similarly situated for all functional intents and purposes" cannot justify regulatory distinctions between them. Id. at 668.

### b. Application

In this case, as in Third Church of Christ and Chabad Lubavitch, this Court need not decide "whether the equal terms provision . . . requires evidence of a 'similarly situated' secular comparator to establish a claim" or "on what ground the comparison must be made." Chabad Lubavitch, 768 F.3d at 196. Plaintiff is likely to succeed under even the most demanding tests. First, the Ordinance treats religious assemblies less well than secular assemblies that have equivalent impacts on its purposes. Second, the "formal differences" relied on by the Village do not trump the "practical" similarities between churches and the secular organizations the Ordinance treats more favorably. Third Church of Christ, 626 F.3d at 668, 671. And third, no compelling interest justifies the unequal treatment.

The Village makes three main arguments to defend excluding churches from the C-1 zone without violating the Equal Terms provision. First, it argues that the Church knew "there were no churches operating in the C-1 district" before it purchased the Property, and it "would almost certainly have been allowed to locate and operate a church had they purchased property within the B-1 and B-2[8] (business) districts (as a matter of right) and/or in the R-1 or R-2 (residential) districts (through special exception)." Opp'n at 23. However, "[t]he existence of alternative sites for a church is relevant only when a zoning ordinance is challenged as imposing a 'substantial burden' on religious uses of land." Digrugilliers v. Consol. City of Indianapolis, 506 F.3d 612, 616 (7th Cir. 2007). "The equal-terms section is violated whenever religious land

---

[8] There does not appear to be such a thing as a "B-2" zone in the Village Code.

uses are treated worse than comparable nonreligious ones, whether or not the discrimination imposes a substantial burden on the religious uses. Id.

Second, the Village argues that C-1 is a "commercial zone," and since the church is not a "commercial enterprise," the Village may lawfully exclude it. Opp'n at 23. Third—though the Village did not press the argument in its Opposition—the ZBA pointed to a New York law that prohibits the state liquor authority from issuing licenses for the on-premises consumption of liquor within 200 feet of a church or school. ZBA R. at 43. [9] It reasoned that the distinction the state law encodes (between churches and otherwise similar secular organizations, which do not trigger the 200-foot protective zone) permits the Village to treat churches differently from otherwise comparable assemblies. ZBA R. at 43. The Court will address these two arguments in turn.

### 1. Commercial Purposes

In its Opposition, the Village argues that excluding churches from the C-1 district "does not violate the 'equal terms' provision of RLUIPA" because "churches are not similarly situated to the allowed uses in that district (i.e. restaurants, hotels, theaters, convenience stores, etc.)," which are "commercial ventures" that serve "the regulatory purpose" of the Code in the C-1 district. Opp'n at 24. A "church," it points out, "is not a commercial enterprise" because it "is not in the business of selling items or libations to the public." Id. at 23. "By contrast, retail stores, restaurants, hotels, and convenience stores . . . focus on selling goods, lodging and/or libations to the general public and are for-profit entities." Id.

This argument might have been successful if the Village had designed C-1 as a commercial district and allowed secular assemblies only if they drew more shoppers than

---

[9] The Village did, belatedly, raise the liquor law as an argument in its Response to the brief of the United States. Resp. to U.S. at 4–5.

churches do. In <u>Lighthouse</u>, the Third Circuit held that a city could exclude a church from a downtown area undergoing redevelopment under a "Redevelopment Plan"[10] that had "well documented" goals to attract taxable retail businesses, create jobs, and "encourage a 'vibrant' and 'vital' downtown residential community centered on a core 'sustainable retail main street.'" <u>Lighthouse</u>, 510 F.3d at 258, 270. The Plan served those purposes in an "evenhanded" manner, "strictly limit[ing]" the use of properties in the downtown area and "allow[ing] only the kind of assemblies that are likely to further its goal"—"restaurants, theaters, bars, clubs, [and] retail shops"—which "generate[d] relatively high income and encourage visitors to linger in the downtown area into the evenings." <u>Id.</u> at 258, 272, 275. And the Plan prohibited, in addition to churches, "some of the most important forms of civil assembly" like "government buildings (which would be unlikely to generate the late-hours traffic [the city] wishe[d] to encourage) and schoolhouses." <u>Id.</u> at 276. The court found that churches and schools would obstruct the Plan's goals because New Jersey law prohibited the issuance of liquor licenses within 200 feet of a house of worship. <u>Id.</u> at 270. It reasoned that the city "could not create a downtown area where restaurants, clubs, bars, retail and entertainment facilities synergize if [the city] could not issue liquor licenses throughout that area." <u>Id.</u> at 272.

However, the court in <u>Lighthouse</u> also held that an older ordinance nearly identical to the Village's Ordinance violated RLUIPA. <u>Id.</u> at 272–73. "Unlike the Plan, the ordinance's aims [were] not well documented." <u>Id.</u> In addition, the ordinance did not demonstrate the same

---

[10] Under New Jersey Law, a "redevelopment plan" is a regulation adopted on "a finding that the specifically delineated project area is located in an area in need of redevelopment or in an area in need of rehabilitation, or in both." <u>Lighthouse</u>, 510 F.3d at 258 n.5 (quoting N.J.S.A. 40A:12A–7(A). It "include[s] an outline for the planning, development, redevelopment, or rehabilitation of the project area sufficient to indicate . . . [i]ts relationship to definite local objectives as to appropriate land uses" and must propose "land uses and building requirements in the project area." <u>Id.</u>

"internal consistency" in pursuit of identifiable objectives. Id. Instead, it "permitted a range of uses" in the district, including "educational service and college, assembly hall, bowling alley, motion picture theater, governmental service, [and] municipal building" that did not share discernable criteria. Id. The court found that "it [was] not apparent from the allowed uses why a church would cause greater harm to regulatory objectives than an 'assembly hall' that could be used for unspecified meetings." Id. at 272–73. As the ordinance did not focus on a goal that called for liquor outlets, the ABC law was irrelevant.

There is no material difference between the Ordinance and the invalid ordinance in Lighthouse, 510 F.3d at 272. The commercial purposes identified in the Village's brief, Opp'n at 23–24, are also not "well-documented" in the record. Rather, according to the Ordinance, the C-1 zone was designed not only to promote commerce, as the Village now suggests, but also to provide "recreational and cultural facilities . . . for the community as a whole." § 325-11(A). Moreover, the diverse uses permitted in the zone elude classification under any "accepted zoning criterion," River of Life, 611 F.3d 367; many do not drive economic development or any other purpose a church would obstruct. Instead, just as the ordinance (unlike the Plan) in Lighthouse allowed government buildings and "assembly hall[s]" that could be used for "unspecified meetings" of secular character, the Village's C-1 zone permits property owners to host meetings for nearly every purpose—business, governmental, "education[al]," "[f]raternal," "social club," "charitable," or "philanthropic"—except for religious purposes. Village Code, § 325-11(B)(1)(r). Since the Village created what it now "purports to be a pure commercial district" but in fact "allow[ed] other uses"—nearly every other type of non-commercial secular assembly—in the same zone, this case is an "easy victory" for the Church under any test. River of Life, 611 F.3d at 373–74; accord Lighthouse, 510 F.3d at 272.

14

Indeed, there is no reason to believe that "fraternal," "social" or "philanthropic" gatherings would be any more likely to generate commerce, contribute to tax revenues, or (with the exception perhaps of government buildings) be more open to the public than religious services. Congress in passing RLUIPA expressed concern that "fraternal organizations," "lodges, museums, [and] municipal buildings"—all permitted in C-1—had similar impacts on zoning objectives yet were "often permitted as of right in zones where churches require[d] a special use permit." H.R. Rep. 106-219, 1999 WL 462644, at *19 (July 1, 1999). In fact, religious services often have cultural, educational, philanthropic, and fraternal purposes. See Lighthouse, 510 F.3d at 289 (Jordan, J., dissenting in part) (pointing out that "[m]any people who attend church services are seeking edification and learning"). Case in point: the ZBA had difficulty distinguishing churches from fraternal, charitable, philanthropic, or social organizations for zoning purposes. ZBA R. at 25–27. Chairperson Stuntz observed that charitable organizations (indeed, the Church is one) and other permitted uses are non-profit and tax-exempt. ZBA R. at 25.[11] So are government buildings and certain fraternal and social clubs, charitable groups, education groups, and philanthropic groups, N.Y. Real Prop. Tax Law §§ 404, 406, 420-a, 420-b. In addition, a Postdam, New York resident commented that the church "does bring him and other people to the Village where they consume services from other institutions which are operating for commercial reasons, such as restaurants offering meals after services." ZBA R. at 10–11. A Canton resident remarked that "as soon-to-be members of the church, the ability to walk to local buildings as well as the church within the Village is really appealing." Id. at 10. There is no reason to think secular non-profits would draw more (or more desirable) customers.

---

[11] Indeed, Stuntz indicated that "taxes didn't matter" to the ZBA's decision. ZBA R. at 38, 42.

The briefs and the ZBA Record reveal only one material ground on which to distinguish church from fraternal, philanthropic, or social assemblies: its "religious aspect." ZBA R. at 27. As one member of the public put it, "[f]raternal organizations are not places of worship. A fraternal organization is not a church." Id. In other words, the C-1 zone bans educational, fraternal, and philanthropic assemblies "only when they are [held] for religious reasons." Smith, 494 U.S. at 877. As a result, it violates constitutional free exercise principles and, therefore, RLUIPA. See Midrash, 366 F.3d at 1230–31 (holding that purportedly "commercial" zone that permitted "private clubs" that operated for "social, educational, and recreational" purposes but excluded churches and synagogues because of their "religious and spiritual" purposes violated RLUIPA).

For the first time in its Response to the United States' Statement of Interest, the Village argues that it is not enough to conclude that the secular assemblies the Ordinance permits (such as fraternal or charitable meetings) would have similar impacts on the Ordinance's purposes. Resp. to U.S. at 3–4. Rather, the Village now argues that the Second Circuit's decision in Chabad Lubavitch requires the Church to point to an actual building in the C-1 zone that is now being used for fraternal, charitable, or other similarly situated secular assemblies. Id. (citing Chabad Lubavitch, 768 F.3d at 197–98). However, RLUIPA does not require religious organizations to bear the burdens imposed by a facially discriminatory regulation until a comparable secular organization comes along to benefit from the regulation's unlawful preference. See e.g., Lighthouse, 510 F.3d at 266, 272 (entering summary judgment invalidating ordinance because its language would permit "assembly halls," but not churches, in the zone; holding that "there is no need . . . for the religious institution to show that *there exists* a secular comparator that performs the same functions" as the plaintiff) (emphasis added).

Unlike the plaintiffs here and in <u>Lighthouse</u>, the plaintiff in <u>Chabad Lubavitch</u> did not assert that the statute at issue disfavored religious organizations on its face. Rather, Connecticut law "required that nearly *all* entities seeking to modify a property in a historic district [to] obtain a certificate of appropriateness" from a local commission "applying loosely defined and subjective standards to discrete applications." <u>Chabad Lubavitch</u>, 768 F.3d at 193–94. The Second Circuit noted that the law—unlike the ordinance here (as interpreted by the ZBA) and in <u>Lighthouse</u>—did "not facially discriminate against religious assemblies or institutions" and was not "gerrymandered to place a burden solely on religious, as opposed to non-religious, assemblies or institutions." <u>Id.</u> at 198 n.11. Rather, the plaintiffs in <u>Chabad Lubavitch</u> challenged to the commission's "application" of the statute: the commission's discrete decision denying the plaintiffs' request to modify their building. <u>Id.</u> at 190. Their as-applied challenge required proof that the commission applied the same statute to grant a comparable request by a secular group. <u>Id.</u> at 197. The Church's facial challenge does not. <u>See</u> <u>Field Day</u>, 463 F.3d 167, 174 (explaining that "a 'facial challenge' to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual").

### 2. *Alcoholic Beverage Control Law*

The ZBA, however, identified another reason for excluding churches from C-1. After it "distilled" the issue to "whether churches are treated less than equal to non-religious uses that have a similar impact on the C-1 district," it cited New York's Alcoholic Beverage Control law to distinguish churches from the permitted uses. That law provides that

> No retail license for on-premises consumption shall be granted for any premises . . . on the same street or avenue and within two hundred feet of a building occupied exclusively as a school, church, synagogue or other place of worship.

N.Y. Alco. Bev. Cont. Law § 64(7) (the "ABC Law").[12] The ZBA reasoned that "either a school or church would activate the ABC law and hinder the usage of surrounding properties." ZBA R. at 43. And it concluded that since "the code does not allow either churches or schools" in C-1 zones and the permitted uses "do not hinder the other allowed uses," the Zoning Code "does not treat churches less than equal compared to secular uses that would have the same impact [on] proximate properties in the C-1 district." Id.

However, as discussed, New Jersey's near-identical ABC law did not save the similarly ill-defined and overinclusive zone in Lighthouse. 510 F.3d at 272. The Third Circuit majority *did* rely on the ABC law to uphold the Plan. Id. at 270. However, the Court disagrees with its reasoning, as Judge Jordan did in his partial dissent. Id. at 290. RLUIPA does not permit a state government's municipal subdivisions to single out religious assemblies for exclusion just because the state, by self-imposed laws *favoring* churches, made them uniquely burdensome to accommodate. See Digrugilliers, 506 F.3d at 614–16.

In Digrugilliers, the Seventh Circuit confronted Indianapolis' attempt to use an identical ABC law to justify excluding churches from a zone that permitted assembly halls, "community centers," "civic clubs," and museums. Id. The court explained:

> government cannot, by granting churches special privileges ([for example,] the right of the church to be free from offensive land uses in its vicinity), furnish the premise for excluding churches from otherwise suitable districts.

Id. at 616. The court noted that by giving churches special benefits, the liquor law might violate the Establishment Clause. Id. at 616–17 (citing Larkin v. Grendel's Den, Inc., 459 U.S. 116, 124 (1982)). In any event, the court continued:

> It is irrelevant that the protective zones to which the district court pointed in upholding the City's exclusion of churches from districts zoned C–1 were

---

[12] N.Y. Alco. Bev. Cont. Law § 64 governs "license[s] to sell liquor." Id. § 64(1). The definition of "liquor" includes only "distilled alcoholic beverages" and not wine or beer. Id. § 3.

commanded by the state, while the exclusion itself was commanded by the City. The City is part of the government of Indiana, and if it would violate the federal Act for the City to exclude churches from C–1 districts—and since the City does not argue that the state is *required* by the First Amendment to create protective zones around churches—the City may not exclude churches from those districts. For the federal Act treats state and local government interchangeably, 42 U.S.C § 2000cc–5(4)(A)(i), and Indianapolis's power to zone is conferred by state law. . . . [A] state cannot be permitted to discriminate against a religious land use by a two-step process in which the state's discriminating in favor of religion becomes a predicate for one of the state's subordinate governmental units to discriminate against a religious organization in violation of federal law.

Id. at 617.

For similar reasons, the Court concludes that the ABC Law creates just the kind of "formal difference" between religious and secular assemblies "similarly situated for all functional intents and purposes" that does not justify their unequal treatment. Third Church of Christ, 626 F.3d at 668. "RLUIPA is a federal law, and no state or local government can defend against a charge that it has violated federal law on the basis that its actions were required by state law." Lighthouse, 510 F.3d at 290 (Jordan, J., dissenting in part); see also CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 663 (1993) ("Where a state statute conflicts with, or frustrates, federal law, the former must give way.") (citing U.S. Const. Art. VI, cl. 20). To remove any doubt on this point, RLUIPA prohibits selective burdens imposed by "government," both state and local. §§ 2000cc(b)(1), 2000cc–5(4)(A)(i); see also Envtl. Encapsulating Corp. v. City of New York, 855 F.2d 48, 54 (2d Cir. 1988) ("[I]t is well-settled that a municipality is merely a political subdivision of the State from which its authority derives."). "Were it otherwise, a state could nullify RLUIPA simply by passing a statute mandating that churches be treated on unequal terms." Id. And cities in states like New York could use state laws meant to *protect* churches to justify *excluding* them from zones open to "secular humanist organizations," River of Life, 611 F.3d at 370, Masonic Lodges, and other "fraternal organizations," H.R. Rep. 106-219, 1999 WL 462644, at *19-20 (criticizing zoning laws that permitted such assemblies but banned churches).

States cannot license their subdivisions to codify the very inequalities Congress proscribed—"lest it be federal law that is preempted by the state." Abdu-Brisson v. Delta Airlines, Inc., 128 F.3d 77, 86 (2d Cir. 1997).

The majority in Lighthouse reached a contrary conclusion because it was satisfied that the city's "Plan and the New Jersey [liquor] statute, taken together, [did not] suggest improper motives." 510 F.3d at 272 (adding that it had "no concern about the earnestness of [the city's] intent with the Plan"). But the majority's reliance on the city's benign motives has no support in the Free Exercise caselaw it purported to apply. The fact that a municipality has good reasons for a regulation's religion-based distinctions does not make its regulation "neutral" toward religion or "evenhanded" in pursuit of its aims. Id. at 275. Rather, when a state "government"—through its legislature, its political subdivisions, or both—"targets religious conduct for distinctive treatment" or "singl[es] out a religious practice for special burdens," it must have *compelling* reasons for doing so, even if the law does not "stem from animus" or "religious hostility." Cent. Rabbinical Cong., 763 F.3d at 197; see also Lukumi, 508 U.S. at 559 (Scalia, J., concurring) ("Had the ordinances here been passed with no motive on the part of any councilman except the ardent desire to prevent cruelty to animals . . . they would nonetheless [have been] invalid."). A law that prohibits religious but not other conduct that equally detracts from the law's goals creates the "appearance of a prohibition that society is prepared to impose upon" religion "but not upon itself." Lukumi, 508 U.S. at 545–46. Such selective treatment, even without religious animus, is the "evil . . . the requirement of general applicability is designed to prevent." Id.

If the Ordinance relies on the ABC Law, the Court must ask whether the Ordinance "regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate . . . interests purportedly justifying" the ABC Law. Cent. Rabbinical Cong., 763F.3d at 193. In Larkin v. Grendel's Den, Inc., the Supreme Court recognized that liquor-free

"protective zones" can have a legitimate secular purpose: to shield "spiritual, cultural, and educational centers from the 'hurly-burly' associated with liquor outlets." 459 U.S. 116, 123 (1982). Perhaps the Ordinance is a paternalistic way to pursue the same goal; by keeping churches and schools out of the downtown C-1 zone containing "taverns," it might aim to protect those "spiritual, cultural, and educational centers" from liquor-induced noise and commotion. However, the Court in Grendel's Den suggested that a law pursuing those same protective objectives should apply not only to churches and schools but also to other "like institutions." Id. at 123–24. The Ordinance does not follow this advice. Instead, it permits a wide range of secular assemblies—spiritual, cultural, and educational—that could equally use protection. See Code, § 325-1(B); cf. Digrugilliers, 506 F.3d at 617 (reasoning that "[t]he 200-foot protective zone" could violate the establishment clause because it "give[s] churches privileges that similarly situated secular users of C–1, other than schools, do not enjoy"). Therefore, instead of pursuing religion-neutral aims consistently, the Ordinance is "substantially underinclusive," Cent. Rabbinical Cong., 763 F.3d at 193, and "single[s] out the religious for [the] disfavored treatment" of exclusion. Trinity Lutheran, 137 S. Ct. at 2020. Its selectivity violates free exercise principles and, therefore, RLUIPA.[13]

---

[13] The fact that the ABC law, and therefore the Ordinance (as interpreted by the ZBA) also targets schools does not alchemize the Ordinance into an evenhanded attempt to pursue religion-neutral aims. The omission of all other educational and charitable organizations from the ABC Law, and their inclusion in the C-1 zone, still makes both laws underinclusive. Cent. Rabbinical Cong., 763 F.3d at 193. RLUIPA prohibits zoning laws from treating "*a* religious assembly or institution on less than equal terms with *a* nonreligious assembly or institution." § 2000cc(b)(1) (emphasis added). Therefore, "a religious plaintiff under the Equal Terms Provision" need only identify a "*better*-treated secular comparator" that is similarly situated to prevail. Lighthouse, 510 F.3d at 268 (emphasis added); accord Third Church of Christ, 626 F.3d at 670. "[T]oss[ing] in" schools "to give the impression of doling out evenhanded treatment" does not excuse an ordinance that prefers other valid comparators to churches. Digrugilliers, 506 F.3d at 617.

### 3. *Strict Scrutiny*

The Third, Fifth, Seventh, and Ninth Circuits would stop there. <u>Lighthouse</u>, 510 F.3d at 269; <u>Opulent Life</u>, 697 F.3d at 292; <u>River of Life</u>, 611 F.3d at 370–71; <u>Centro Familiar</u>, 651 F.3d at 1171. However, the Eleventh Circuit has held that "a violation of the Equal Terms provision is not necessarily fatal to the land use regulation." <u>Primera Iglesia Bautista Hispana of Boca Raton</u>, 450 F.3d 1295, 1308 (11th Cir. 2006) (citing <u>Midrash</u>, 366 F.3d at 1232). Under that court's rubric, a municipality may treat religious assemblies worse than secular assemblies if the unequal treatment survives strict scrutiny: that is, if the defendant "establishes that the conduct employs a *narrowly* tailored means of achieving a *compelling* government interest." <u>Id.</u> (citing <u>Lukumi</u>, 508 U.S. at 546). Such a law must "advance interests of the highest order." <u>Lukumi</u>, 508 U.S. at 546. "A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." <u>Lukumi</u>, 508 U.S. at 546. The Village does not argue that the C-1 zone is narrowly tailored to serve a compelling governmental interest—for good reason. The Ordinance does not survive strict scrutiny.

First, the interests underlying New York's ABC law do not supply a compelling interest to justify excluding churches from the C-1 zone. As discussed, the law was designed to protect churches—to insulate them from the noise, behavior, and crowds associated with liquor outlets. Paternalism is a dubious justification for discriminatory burdens. <u>Frontiero v. Richardson</u>, 411 U.S. 677, 684 (1973). Indeed, when passing RLUIPA, Congress was wary of "[l]and use schemes [that] give appearance that regulators are being generous to churches, when just the opposite is true." H.R. Rep. 106-219, 1999 WL 462644, at *18-19. Nor, as described above, does the Ordinance pursue the ABC Law's secular objectives "with respect to analogous non-religious conduct" that could also benefit from the 200-foot protective zone. <u>See</u> <u>Lukumi</u>, 508 U.S. at

22

546–47 ("[A] law cannot be regarded as protecting an interest 'of the highest order'. . . when it leaves appreciable damage to that supposedly vital interest unprohibited.").

Finally—even if the Village had compelling interests in putting some number of liquor outlets downtown *and* in separating them by 200-feet from churches—there is no evidence that the downtown area is too small to accommodate the desired mass of new bars along with churches and their protective zones. Indeed, the Church represents that there are only five properties within a 200-foot block of the church—a "credit union, a law firm, a bank, an insurance agency, and a locksmith"—none of which appear to need a liquor license. Mem. at 19. And the Village's Opposition does not argue that anyone has plans to open a bar in the area.[14] Thus, the Village has not demonstrated it needs to ban churches from the whole downtown district to accomplish any compelling goal. Lukumi, 508 U.S. at 546 ("The absence of narrow tailoring suffices to establish the invalidity of the ordinances.").

Accordingly, the Church has a strong likelihood of success on the merits of its statutory Equal Terms claim against the Ordinance. In light of this conclusion, the Court need not address the merits of the Church's claim under the Equal Protection Clause or its challenges to the Zoning Code as a whole. See Mem. at 14–18.

### C. Irreparable Harm

Before issuing a preliminary injunction, the Court must find that the plaintiff will suffer "injury . . . if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the 'remedies available at law, such as monetary

---

[14] New churches would not affect establishments that already have liquor licenses, which the ABC Law grandfathers and exempts from the 200-foot rule. See N.Y. Alco. Bev. Cont. Law § 64(7)(c) (providing that "no license shall be denied to any premises at which a license under this chapter has been in existence continuously from a date prior to the date" the "school, church, synagogue or other place of worship" opened within 200 feet of the premises).

damages,' are inadequate to compensate for that injury." <u>Salinger</u>, 607 F.3d at 80 (citing <u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006)). The Village argues that the Church's inability to use the Property for worship services or other ministry activities does not inflict irreparable harm because the ZBA approved the Church's application to use the Property as an office, and the Church has other places to worship while this case is litigated. Opp'n at 20–22. The Court is unpersuaded and finds that the Ordinance inflicts irreparable harm by preventing the Church from worshipping in the property it purchased, which violates its rights under RLUIPA. In addition, the alternative spaces available to the Church are inadequate to serve its sincere religious needs.

In <u>Opulent Life</u>, the Fifth Circuit reached the same conclusion. 697 F.3d at 295. The district court declined to enjoin a zoning law that excluded the plaintiff-church from its preferred meeting space in violation of the Equal Terms provision, reasoning that the church's "ability freely to exercise its religion is not currently being harmed because its [substitute] meeting space [was] adequate." 697 F.3d at 295. The court of appeals reversed, explaining:

> Most basically, [the church] has satisfied the irreparable-harm requirement because it has alleged violations of its First Amendment and RLUIPA rights. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976). This principle applies with equal force to the violation of RLUIPA rights because RLUIPA enforces First Amendment freedoms, and the statute requires courts to construe it broadly to protect religious exercise. <u>See</u> 42 U.S.C. § 2000cc–3(g) ("This chapter shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.").

<u>Id.</u> at 278.

"Even assuming *arguendo* that [the court was] required to consider the specific evidence in the record," the court found that the plaintiff-church's substitute meeting place was too small, "allow[ed] no room for [the church] to grow," "prevented would-be members from joining[,] and limited Opulent Life's ability to welcome visitors," all of which "frustrate[d] [the church's]

religious mission." 697 F.3d at 296. "[T]he sufficiency of this evidence [was] buoyed by the rule that courts may not second-guess a religious entity's sincere belief that certain activities are central to or required by its religion." Id. (citing Hobbie v. Unemployment Appeals Comm'n, 480 U.S. 136, 144 n. 9 (1987)).

The Fifth Circuit's persuasive analysis applies in nearly every respect to this case. RLUIPA identifies "the use, building, or conversion of real property for the purpose of religious exercise [as] religious exercise of the person or entity that uses or intends to use *the* property for that purpose." § 2000cc–5(7) (emphasis added). Thus, every day the Church cannot use "*the* property" it bought for religious purposes prevents it from engaging in "religious exercise" in Congress's eyes. §2000cc–5(7).

In addition, RLUIPA's legislative history confirms that "the right to build, buy, or rent" a space adequate to [a church's] needs and consistent with their theological requirements" is "an indispensable adjunct of the core First Amendment right to assemble for religious purposes." 146 Cong. Rec. 16698. Pastor Sinclair testified that the conference room at the "Best Western Hotel where the Church currently rents space does not always have room for the Church." Dkt. No. 14-3 ("Sinclair Declaration") ¶¶ 5.[15] Although using the Property as an "office" may meet some of the Church's needs, the ZBA did not permit it to "hold assemblies for worship" on the Property. March 2019 ZBA Dec. at 32. The "lack of a permanent home" where the Church can hold church continues to "create[] uncertainty among congregants—a common question heard these days is 'where will church meet next week?'" Compl. ¶ 67. It also requires church members to "haul equipment, instruments, books, and more, to the Best Western Hotel early every Sunday morning." Id. ¶ 69. Therefore, it burdens the various ministries—baptisms, weddings, communions, evangelism, preaching, and musical performances—the Church conducts during

---

[15] Sinclair's Declaration is Exhibit C to the Church's Memorandum.

congregate services. Id. ¶ 59. "The Church believes that all of its ministries are in furtherance of its mission and constitute acts of worship." Id. ¶ 61.

It is beyond "the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of a particular litigant's interpretations of those creeds." McEachin v. McGuinnis, 357 F.3d 197, 201 (2d Cir. 2004) (quoting Hernandez v. Comm'r, 490 U.S. 680, 699 (1989)). The Court is equally unequipped to calculate how much money the Village could pay the Church or its members to compensate for their inability "to worship . . . in accordance with the dictates of [their] own conscience." Wallace v. Jaffree, 472 U.S. 38, 49 (1985). Accordingly, ongoing irreparable harm is established. See Salinger, 607 F.3d at 80.

**D. Balance of Hardships**

As already discussed, the Village does not point to any reason why allowing Church members to assemble for worship on the Property would damage the purposes of the C-1 zone or burden any neighboring land owner, none of whom have reason to seek liquor licenses. See supra, at 22–23. Accordingly, it has not identified any hardship that would outweigh the continuing violation of the Church's federal right to exercise its religion on the Property.

**E. The Public Interest**

Finally, "securing First Amendment rights is in the public interest," and "the Government does not have an interest in the enforcement of an unconstitutional law." New York Progress & Prot. PAC v. Walsh, 733 F.3d 483, 488 (2d Cir. 2013). "This principle applies equally to injunctions protecting RLUIPA rights because, as discussed, RLUIPA enforces the First Amendment and must be construed broadly." Opulent Life, 697 F.3d at 298.[16]

---

[16] The Village does not identify any "costs and damages" it will incur if the Ordinance's enforcement against the Church is found to be wrongfully restrained. Fed. R. Civ. P. 65(c). Accordingly, the Court grants the Church's request for a waiver of the bond requirement. Mot. ¶ 7.

\* \* \*

The Court notes that the Village's religion-based distinction was imposed in response to a predicament imposed by state and federal law. Because of the ABC law, to comply with RLUIPA, the Village must either (a) permit churches in its downtown area and restrict the space available for bars; or (b) narrow the C-1 district and exclude uses (like fraternal lodges or charitable groups) that are equivalent to churches in their relevant impacts on development goals or the surrounding properties. See Petra Presbyterian Church v. Vill. of Northbrook, 489 F.3d 846, 849 (7th Cir. 2007) (noting that municipality whose "ordinance . . . arbitrarily treated religious membership organizations worse than other membership organizations, thus violating not only RLUIPA but also the free-exercise clause of the First Amendment" could have fixed the issue "by permitting religious organizations in the. . . zone, or by forbidding all membership organizations in the zone"). However, the federal and New York legislatures imposed this difficult choice. Only they can decide whether to ease it.

Because the Church is likely to succeed on the merits of its RLUIPA Equal Terms challenge to the Ordinance and will be irreparably harmed if the Ordinance remains in force against it, and because the balance of hardships and the public interest resolve in the Church's favor, it is entitled to a preliminary injunction.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Motion (Dkt. No. 13) is **GRANTED** in part. The Village, its officers, agents, employees, attorneys and all other persons acting in concert with it, are **ENJOINED** from enforcing the Ordinance (Section 325-11 of the Village Code) to prevent, or attempt to prevent, the Church from using the Property (25 Court Street, Village of Canton, New York) as a church; and it is further

**ORDERED**, that the Motion is otherwise **DENIED**;[17] and it is further

**ORDERED**, that the Church's counsel's request to appear by telephone at any hearing on the Motion (Dkt. No. 15) is **DENIED** as moot.

**IT IS SO ORDERED.**

DATED:     March 29, 2019
           Albany, New York

_Lawrence E. Kahn_
Lawrence E. Kahn
U.S. District Judge

---

[17] "Injunctive relief should be narrowly tailored to fit specific legal violations. Accordingly, an injunction should not impose unnecessary burdens on lawful activity." Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 220 (2d Cir. 2003). The Church does not assert that other religious organizations seek to operate in the C-1 zone and are being prevented from doing so. Accordingly, the Court denies the Church's request to enjoin the Village from enforcing the Ordinance against parties other than the Church or "from enforcing its [entire] zoning code." Mot. at 3. It would be inappropriate issue such a broad and disruptive injunction based on one zone's discrimination against religious assemblies, which, on the evidence presented, affects only the Church and its members.